**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| **LEON DAVID DORSEY IV,** | § | |
|     **PETITIONER,** | § | |
| **vs.** | § | **No. 3:04-CV-1175-K** |
| | § | |
| **NATHANIEL QUARTERMAN,** | § | |
| **DIRECTOR, TEXAS DEPARTMENT OF** | § | |
| **CRIMINAL JUSTICE,** | § | |
| **CORRECTIONAL INSTITUTIONS** | § | |
| **DIVISION,** | § | |
|     **RESPONDENT.** | § | |

**MEMORANDUM OPINION AND ORDER
DENYING PETITION FOR WRIT OF HABEAS CORPUS**

Petitioner Leon David Dorsey, sentenced to death for capital murder, petitions the Court for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, contending that his conviction and sentence are unconstitutional in several respects. The Court denies Petitioner's petition for a writ of habeas corpus.

## I. HISTORY OF THE CASE

A jury convicted petitioner of capital murder, and his punishment was assessed at death by lethal injection. *State v. Dorsey*, No. F98-69472-L (Criminal District Court No. 5, Dallas, Texas, May 25, 2000). The Texas Court of Criminal Appeals affirmed both the conviction and the death sentence in an unpublished opinion. *Dorsey v. State*, No. 73, 836 (Tex. Crim. App. October 2, 2002). Petitioner filed a state application for writ of habeas corpus on May 6, 2002. The Court of Criminal Appeals denied relief in an unpublished order. *Ex parte Dorsey*, No. 58,161-01 (Tex. Crim. App. February 18, 2004).

Petitioner filed the instant federal writ of habeas corpus on December 20, 2004, challenging his conviction and death sentence. Respondent filed an answer on March 2, 2005 and furnished the state court records.

## II. ISSUES

Petitioner asserts that he is being held unlawfully by respondent on the following nine claims raised in twelve grounds for relief :

A.   The trial court violated petitioner's right to an impartial jury, right to be free from cruel and unusual punishment, and right to due process of law under the Sixth, Eighth, and Fourteenth Amendments in denying petitioner's motion for a mistrial after a juror viewed an exhibit intended for record purposes only (ground one);

B.   Petitioner was denied his Sixth Amendment right to effective assistance of counsel because trial counsel permitted a juror to view an exhibit that had not been entered into evidence (ground two);

C.   The evidence is legally insufficient to support the jury's verdict to the future dangerousness punishment special issue (ground three);

D.   The trial court erred in denying four of petitioner's challenges for cause (grounds four through seven);

E.   The State exercised its peremptory challenges during voir dire in a racially discriminatory manner, in violation of *Batson v. Kentucky*, 476 U.S. 79 (1986) (ground eight);

F.   The punishment special issues are unconstitutional under the Fifth, Sixth, Eighth, and Fourteenth Amendments because several terms are not defined for the jury in the jury charge (ground nine);

G.   Petitioner's rights under the Eighth and Fourteenth Amendments were violated by the Texas "12-10" rule because the jury was not informed of the effect of one holdout juror at punishment with respect to the punishment special issues (ground ten);

H.   Texas' death penalty scheme is unconstitutional under the Fifth, Eighth, and Fourteenth Amendments because it cannot simultaneously restrict a jury's

2

discretion to impose the death penalty while allowing unlimited discretion to consider all evidence that militates against the imposition of the death penalty (ground eleven); and

I.     Petitioner is entitled to relief under the Fifth and Fourteenth Amendments based on the cumulative effect of all the foregoing constitutional errors (ground twelve).

## III.  STANDARD OF REVIEW

Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. 104-132, 110 Stat. 1217, on April 24, 1996.  Title I of the Act applies to all federal petitions for habeas corpus filed on or after its effective date.  *Lindh v. Murphy*, 521 U.S. 320, 326 (1997). Because petitioner filed the instant petition after its effective date, the Act applies to his petition.

Title I of the AEDPA substantially changed the way federal courts handle habeas corpus actions.  Under 28 U.S.C. § 2254(d), as amended by the AEDPA, a state prisoner may not obtain relief

with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim —

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

"In the context of federal habeas proceedings, a resolution (or adjudication) on the merits is a term of art that refers to whether a court's disposition of the case was substantive, as opposed to procedural."  *Miller v. Johnson*, 200 F.3d 274, 281 (5th Cir. 2000).  In this case, the denial of petitioner's state writ constitutes an adjudication on the merits.  *See Ex parte Thomas*, 953 S.W.2d 286, 288-89 (Tex. Crim. App. 1997) (holding that a denial, rather than a dismissal, signifies an adjudication on

the merits).  The court of appeals also considered the merits of petitioner's claims raised on direct

appeal.  *See Sims II.*  The AEDPA standards enumerated in 28 U.S.C. § 2254(d) thus apply.

Section 2254(d)(1) concerns pure questions of law and mixed questions of law and fact.

*Martin v. Cain*, 246 F.3d 471, 475 (5th Cir. 2001).  A decision is contrary to clearly established

Federal law, within the meaning of § 2254(d)(1), "if the state court arrives at a conclusion opposite

to that reached by [the Supreme Court] on a question of law or if the state court decides a case

differently than [the] Court has on a set of materially indistinguishable facts."  *Williams v. Taylor*,

529 U.S. 362, 412-13 (2000).

With respect to the "unreasonable application" standard, *Williams* instructs that a writ must

issue "if the state court identifies the correct governing legal principle from [the] Court's decisions

but unreasonably applies that principle to the facts of the prisoner's case."  *Id.* at 413; *accord Penry

v. Johnson*, 532 U.S. 782, 792 (2001).  Likewise under *Williams*, a state court unreasonably applies

Supreme Court precedent if it "unreasonably extends a legal principle from [Supreme Court] prece-

dent to a new context where it should not apply or unreasonably refuses to extend that principle to

a new context where it should apply."  529 U.S. at 407.  "[A] federal habeas court making the 'un-

reasonable application' inquiry should ask whether the state court's application of clearly established

federal law was objectively unreasonable."  *Id.* at 409; *accord Penry*, 532 U.S. at 793.

Section 2254(d)(2) concerns questions of fact.  *Moore v. Johnson*, 225 F.3d 495, 501 (5th

Cir. 2000).  Under § 2254(d)(2), federal courts "give deference to the state court's findings unless

they were 'based on an unreasonable determination of the facts in light of the evidence presented in

the state court proceeding.'"  *Chambers v. Johnson*, 218 F.3d 360, 363 (5th Cir. 2000).  The

resolution of factual issues by the state court is presumptively correct and will not be disturbed

unless the state prisoner rebuts the presumption by clear and convincing evidence.  28 U.S.C. §

2254(e)(1). The Supreme Court has held that, when claim was dismissed by a state court pursuant

to an independent and adequate state procedural rule, federal habeas review of that claim is barred

unless the prisoner can establish either cause for the default as well as actual prejudice as a result of

the alleged violation of federal law *or* that failure to consider the claims would result in a

fundamental miscarriage of justice. *Coleman v. Thompson*, 501 U.S. 722, 750 (1991); *Harris v.*

*Reed*, 489 U.S. 255, 262 (1989).   To satisfy the independent and adequate requirements, the

dismissal of a claim must "clearly and expressly" indicate that it rests on state grounds which bar

relief, *and* the bar must be strictly and regularly followed by state courts and applied to the majority

of similar claims. *Finley v. Johnson*, 243 F.3d 215, 218 (5th Cir. 2001), *citing Amos v. Scott*, 61 F.3d

333, 338-39 (5th Cir. 1995).

## IV.  FACTUAL BACKGROUND

The Court of Criminal Appeals recited the following factual background in its opinion on

direct appeal:

> The evidence presented at trial showed that, around midnight on April 4, 1994, two employees at a Blockbuster Video store in Dallas were robbed and murdered. The in-store video camera recorded the crime and shows that the perpetrator was a black male with short hair.  Employee Brad Lindsey was shot once in the back; employee James Armstrong was shot twice.  Later that day, appellant admitted committing the robbery and murders to his girlfriend, Arrietta Washington, and to an acquaintance, Antwan Hamilton.  In an interview with a newspaper reporter, Appellant stated that he had burned the jacket and would not disclose the location of the murder weapon.  Washington braided extensions into appellant's hair as a disguise.  Later that week, she reported appellant's admissions to the police.  The police interviewed appellant, but he denied any involvement.  At the time, police erroneously believed appellant was too tall to be the perpetrator, and he was not charged with the crime, which remained unsolved until the case was re-opened in 1998.

5

During the 1998 investigation, police sent the videotape of the robbery-murder to the F.B.I. for an analysis of the perpetrator's height. Based on the new estimate of the perpetrator's height and accurate information about appellant's height, police questioned appellant again, and he confessed. While awaiting trial, appellant again confessed to this offense during an interview with *Dallas Morning News* reporter Jason Sickles. A week before trial, appellant admitted committing the murders to inmate Raymond Carriere. Appellant also sent a letter to another inmate, Rodrick Finley, offering him $5,000 to take the blame for the murders. The police had previously of [sic] suspected Finley of committing the crime.

\*       \*       \*

Washington and Hamilton both testified that the distinctive jacket of unusual design and colors worn by the shooter in the videotape looked just like one often worn by appellant before the offense. They also stated that they never saw appellant wear that particular jacket after the offense. Washington also testified that appellant wore his hair in the same style as that of the shooter at the time of the offense, but that she had altered the appearance of appellant's hair after the offense by adding braid extensions. According to the F.B.I. expert who analyzed the videotape, the shooter was between 5'71/2" tall and 6" tall. Appellant is 5'10" tall.

*Dorsey*, slip op. at 2-4 (footnotes omitted).

## V.  PROCEDURAL ISSUES

Respondent concedes that petitioner has sufficiently exhausted available state remedies on the twelve grounds presented in the instant federal petition. Nevertheless, respondent asserts that a portion of petitioner's first ground and his sixth through eleventh grounds for relief are procedurally barred on federal habeas review because they were denied at the state level on an independent and adequate state law ground. Respondent also initially asserts that petitioner's twelfth ground for relief is also procedurally barred, but does not make this argument in the body of the response, and a review of the state habeas record reveals that this claim was not denied on a state procedural ground, but was decided on its merits by the state habeas court. (Response at 3, 58-60 State Habeas Transcript at 359).

At the state habeas level, the habeas court concluded that petitioner's claims regarding his Eighth Amendment juror bias claim, two of his denied challenges for cause, his *Batson* claim, his claim regarding the lack of definitions for terms in the punishment charge, his claim regarding the Texas "12-10" rule, and his claim regarding the constitutionality of the Texas death penalty scheme were procedurally barred because they were not raised on direct appeal (SHTr.:314-15, 338, 342-43, 349, 353-54, 357-58).  Alternatively, the state habeas court also denied these claims on their merits. This Court has located no Fifth Circuit case addressing whether this state procedural ground, that one is procedurally barred from raising claims at the state habeas level because they were not, and should have been, raised on direct appeal, is one that is an independent and adequate state procedural ground.  The Texas Court of Criminal Appeals on this issue, however, has consistently held that the state writ is available to review a claim that there was a denial of a fundamental federal constitutional right, even if the claim was not raised on direct appeal. *See Ex Parte Goodman*, 816 S.W.2d 383, 385 (Tex. Crim. App. 1991); *Ex parte McKay*, 819 S.W.2d 478, 482 (Tex. Crim. App. 1990); *Ex parte Banks*, 769 S.W.2d 539, 541 (Tex. Crim. App. 1989); *Ex parte Bravo*, 702 S.W.2d 189 (Tex. Crim. App. 1982).  For that reason, this Court declines to hold that the federal constitutional claims petitioner raises in these grounds for relief are procedurally barred because it has not been shown that this state procedural rule is strictly and regularly followed by state courts.  The Court will address all of petitioner's grounds on their merits.

## VI.  EXAMINATION OF THE GROUNDS FOR RELIEF

### A.    Juror Bias Claim

In his first ground for relief, petitioner claims that the trial court violated his constitutional rights when it denied his motion for mistrial after one of the jurors deciding his case viewed an exhibit which was intended to be for record purposes only.  Petitioner argues that this violated his Sixth Amendment right to an impartial jury, his Eighth Amendment right to be free from cruel and unusual punishment, and his Fourteenth Amendment right to due process.

During the guilt phase of petitioner's trial, a reporter for the *Dallas Morning News* testified regarding an interview he had with petitioner, while petitioner was in jail, in which petitioner confessed to murdering the two victims in the instant case. (R. 34:7-9, 12-28, 34-42).  An edited portion of the tape recorded interview was played to the jury. (R. 34:12-13).  A redacted transcript of this interview was admitted into evidence, and an unredacted transcript, containing further discussions between petitioner and the reporter, was admitted for record purposes only. (R. 40: state's exhibits #110, 123).

Shortly after the jury began its deliberations, the jury foreman informed the trial judge, by way of a written note, that he believed there was an exhibit in the jury room that shouldn't be there. (R. 35:75).  Subsequently, all of the members of the jury were questioned in chambers by the trial judge.  Juror Karen Quinton testified that she skimmed through the unredacted transcript (State's exhibit 123) until she reached pages nine through eleven, when she realized that it contained information not testified to by the reporter at trial.  In particular, she read about petitioner having had trouble in school, being mad at a teacher, and thinking about taking a gun to class (R. 35:77-79).  She then stopped reading and told the jury foreman that she did not believe that the jury should have this

8

exhibit. (R. 75, 80-81).  The foreman, Mark Pennington, testified *in camera* that Quinton had told

him that the exhibit had some information on "priors," but that she had not said anything specific

and that he had not read the exhibit himself. (R. 35:75, 83).  Both Quinton and Pennington testified

that they could put aside what they had read or heard, would not consider it in their deliberations,

would be fair and impartial, and would not discuss this matter with the other jurors.  (R. 35:81-82,

83-84).  All of the other ten jurors were also questioned by the trial judge, two of the jurors stated

that they knew that the exhibit contained the entire transcript of the interview, but none of the jurors

had read the exhibit, heard anything Quinton said to Pennington about it, or been told any

information about the exhibit. (R. 35:85-102).  Defense counsel made a motion for mistrial, which

was denied by the trial court. (R. 35:103-05).

On direct appeal, the Court of Criminal Appeals overruled this claim.  Comparing this

incident to the situation where a motion for new trial is filed based on the jury's receipt of "other

evidence," that court looked to the state statute that controlled motions for new trial based on juries

receiving evidence other than that presented at trial.  According to that statute, and case law

interpreting that statute, a motion for new trial should be granted where a jury receives other

evidence during deliberations that is detrimental to the accused.  Applying this law to the instant

case, the Court of Criminal Appeals held that the "other evidence" of the unredacted interview read

by Juror Quinton, regardless whether it was detrimental to petitioner, was not actually "received by

the jury" because it was viewed in part and only by one juror.  Accordingly, the Court of Criminal

Appeals held that the trial court did not abuse its discretion when it denied petitioner's motion for

mistrial. *Dorsey*, slip op. at 11-13; *see also Garza v. State*, 630 S.W.2d 272, 276 (Tex. Crim. App.

1981); *Stephenson v. State*, 571 S.W.2d 174, 176 (Tex. Crim. App. 1978).  At the state habeas level,

trial court concluded that, given the overwhelming amount of evidence supporting the guilty verdict, petitioner's constitutional rights to due process and a fair and impartial jury and his right to be free from cruel and unusual punishment were not violated because one juror was aware that petitioner had committed other, more minor crimes. (SHTr.:320-21).  Looking at this issue for a second time, the Court of Criminal Appeals adopted the trial court's conclusion and denied relief. *See Ex parte Dorsey*, No. 58,161-01, slip op. at 2.

These decisions are not contrary to federal law.  The Supreme Court has stated that, with respect to claims that there was an impermissible outside influence on the jury, due process "means a jury capable and willing to decide a case solely on the evidence before it." *Smith v. Phillips*, 455 U.S. 209, 217 (1982).  The Supreme Court has further stated that, with such claims, the  issue that must be decided is whether the intrusion prejudiced the defendant in that it affected the jury's deliberations and thereby its verdict. *United States v. Olano*, 507 U.S. 725, 739 (1993).  In making this determination, it should be presumed that juries follow the instructions given to them by the court. *Id.*, *citing Richardson v. Marsh*, 481 U.S. 200, 206 (1987), *Francis v. Franklin*, 471 U.S. 307, 324 n. 9 (1985).  Moreover, in the context of a federal habeas review, the Fifth Circuit has held that, even where there has been an extrinsic influence on the jury in violation of the Sixth and Fourteenth Amendments, such error is subject to a harmless error analysis.  *Pyles v. Johnson*, 136 F.3d 986, 992-93 (5th Cir. 1998).  Accordingly, relief would not be warranted unless the influence had a substantial and injurious effect or influence on the jury's verdict.  *Id.*, *citing Brecht v. Abrahamson*, 507 U.S. 619, 635 (1993).

The Fifth Circuit has stated that an impermissible extrinsic influence on a jury occurs when an outside factual matter is disclosed in the jury room which taints the jury's deliberations. See

10

*United States v. O'Keefe*, 722 F.2d 1175, 1179 (5th Cir. 1984), *citing United States v. Winkle*, 587 F.2d 705, 714 (5th Cir. 1979).  In the case at hand, there is little, if any, evidence that the exhibit that was erroneously given to the jury was an extrinsic influence on the jury's deliberations or verdict, as only one juror saw any part of the exhibit, she did not tell any of the other jurors what she read, and she was instructed by the trial judge to set aside any knowledge she had about the exhibit and not to consider it during jury deliberations (R. 35:81-4), an instruction she presumably followed.  But, even were this considered to be an actual extrinsic influence on the jury, petitioner has failed to establish that any influence had a substantial and injurious effect on the jury's verdict.  In that regard, Juror Quinton testified in the hearing before the trial court that she only remembered reading something about petitioner's problems in school and the fact that he considered taking a gun to school.  The evidence presented to the jury at the guilt phase of the trial included evidence that petitioner confessed to the murders to his girlfriend, an acquaintance, the police, and a newspaper reporter.  These confessions were corroborated by the videotape from the store showing a man matching petitioner's description.  And, in the confession to the reporter, petitioner not only acknowledged committing the murders and confessing to his girlfriend, he also stated that he began to wear his hair braided to disguise his appearance and burned the jacket he was wearing at the time of the murders. (R. 34:27-8).  Petitioner also stated in this interview with the newspaper reporter that he had killed the victims because they had "studded" up on him by not cooperating fully (R. 34:37).  Given all of this evidence before the jury supporting petitioner's guilt, petitioner has failed to show that one juror's knowledge of a less serious prior bad act committed by petitioner when he was a child had a substantial and injurious effect on the jury's verdict.  This claim is denied.

**B.      Ineffective Assistance of Counsel Claim**

In his second ground for relief, petitioner claims that his Sixth Amendment right to effective assistance of counsel was violated because his trial counsel failed to prevent the unredacted version of the transcript of petitioner's interview with a newspaper reporter from being sent to the jury room during deliberations.  Petitioner contends that counsel were derelict in their duty to inspect all of the exhibits before the trial court sent them to the jury room and that, because of this, an exhibit that was not admitted into evidence was sent to the jury room during deliberations after the jury requested that it be given all of the evidence.

The Sixth Amendment to the United States Constitution provides criminal defendants a right to effective assistance of counsel during trial.  U.S. Const., art. VI.  To successfully state a claim of ineffective assistance of counsel under Supreme Court precedent, petitioner must demonstrate (1) that counsel's performance was deficient and (2) that the deficient performance prejudiced his defense.  *See Strickland v. Washington*, 466 U.S. 668, 687 (1984).  A failure to establish either prong of this test requires a finding that counsel's performance was constitutionally effective.  *Id.* at 696. To determine whether counsel's performance is constitutionally deficient, courts "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable assistance." *Strickland*, 466 U.S. at 689.  To establish prejudice, a petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

On direct appeal, the Court of Criminal Appeals rejected this argument, holding that petitioner had not proven that his counsel was ineffective under the *Strickland* standard because no

12

prejudice had been shown. *Dorsey*, slip op. at 14-5.  This conclusion is not an unreasonable application of the *Strickland* standard.  As this Court noted earlier, only one juror read any part of the exhibit that was erroneously sent to the jury room, she read only a limited part of the exhibit, and she was instructed not to consider the exhibit in her deliberations.  This did not amount to an extrinsic influence on the jury that had an effect on the deliberations or verdict.  Therefore, prejudice has not been shown because petitioner has failed to establish a reasonable probability that, had the exhibit not been sent to the jury room, the result in the trial would have been different.  Petitioner is not entitled to relief on this claim, and it is therefore denied.

**C.     Sufficiency of the Evidence Claim**

In his third ground for relief, petitioner asserts that the evidence supporting the jury's answer to one of the punishment special issues is legally insufficient.  Specifically, petitioner argues that, considering the fact that, had petitioner received a life sentence, he would not have been eligible for parole for thirty-five years, the evidence presented at trial is legally insufficient to support a finding that there is a reasonable probability that petitioner would constitute a future danger in prison society.

Pursuant to Article 37.071 of the Texas Code of Criminal Procedure, the jury at petitioner's trial was required to answer the following two special issues or questions at the punishment phase of petitioner's trial:

> Do you find from the evidence beyond a reasonable doubt that there is a probability that the defendant, Leon David Dorsey IV, would commit criminal acts of violence that would constitute a continuing threat to society?

> Do you find, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, that there is a sufficient mitigating

circumstance or circumstances to warrant that a sentence of life imprisonment rather
than a death sentence be imposed?

(Transcript at 236-37).  The jury answered the first question "yes."  (*Id.*).

On direct appeal, the Court of Criminal Appeals held that the evidence presented at trial was

sufficient to support this answer.  In reaching its decision, the court recounted the following evidence

presented at the punishment phase of the trial:

> Although appellant was only eighteen when he committed the instant offense,
> he had a history of criminal conduct.  At fourteen, he took a gun to school and
> discharged it in a classroom.  At fifteen, appellant lived on an Air Force base and
> committed several property crimes, including a residential robbery, theft from a
> vehicle, and a theft of some items from lockers at the base gymnasium.  When police
> investigated and found stolen items at appellant's home, they also discovered 20 to
> 25 bullet holes in the basement wall of his house and numerous spent shells.  At
> sixteen, appellant fired a gun at a young couple in another car and verbally threatened
> to kill them.  At eighteen, four months before the instant offense, appellant was
> arrested for unauthorized use of a motor vehicle.  He was convicted, and his sentence
> was probated.  Five months after committing the instant offense, appellant killed a
> convenience clerk during a robbery in Ennis, Texas.  Appellant pled guilty to the
> Ennis murder and, pursuant to a plea agreement, was sentenced to sixty years
> imprisonment.  During his interview with *Dallas Morning News* reporter Sickles,
> appellant admitted to "possibly" killing as many as nine people, "more or less."
> While in prison, appellant was involved in a fist fight, "beat up guards," attempted
> to stab another inmate, and was in possession of weapons, including a sharpened
> spoon and a sharpened eight-inch steel rod.  Appellant also belonged to a prison gang
> known for violent activities.

*Dorsey*, slip op. at 7-8.  The Court of Criminal Appeals' decision is not an unreasonable application

of federal law.

Federal courts have extremely limited habeas review of claims based on the sufficiency of

the evidence, and the standard for reviewing such claims is supplied by *Jackson v. Virginia*, 443 U.S.

307 (1979).  When reviewing such claims against the underlying conviction, the relevant question

"is whether, after viewing the evidence in the light most favorable to the prosecution, any rational

14

trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson*, 443 U.S. at 319.  The *Jackson* standard is also applicable when reviewing claims that the evidence to support an affirmative answer to the future dangerousness special issue is insufficient. *See Martinez v. Johnson*, 255 F.3d 229, 245 (5th Cir. 2001); *Green v. Johnson*, 160 F.3d 1029, 1046 (5th Cir. 1998). Federal courts apply the *Jackson* "standard looking to the state's substantive law, giving great weight to the state court's determination."  *Miller v. Johnson*, 200 F.3d 274, 286 (5th Cir. 2000).  Further, under *Jackson*, "the assessment of the credibility of witnesses is generally beyond the scope of review."  *Schlup v. Delo*, 513 U.S. 298, 330 (1995).  "Determining the weight and credibility of the evidence is within the sole province of the jury."  *United States v. Martinez*, 975 F.2d 159, 161 (5th Cir. 1992).

Petitioner contends that the evidence is insufficient to support the jury's answer to the first special issue under the *Jackson* standard because the evidence presented to the jury revealed that petitioner had committed no serious acts of violence in prison and was instead capable of living peaceably in the prison environment, the environment under which he would be required to live for at least thirty-five years before becoming eligible for parole if given a life sentence. Petitioner also contends that the evidence is insufficient to support the jury's answer to the future dangerousness special issue because the State presented no psychiatric opinion testimony regarding petitioner's future dangerousness.

But, contrary to petitioner's argument, the circumstances of the offense alone may be legally sufficient to support an affirmative answer to the future dangerousness special issue. *Miller v. Johnson*, 200 F.3d at 290.  And, petitioner has pointed to no legal precedent requiring that the State present psychiatric testimony regarding a defendant's future dangerousness in order for a jury's

15

verdict on the future dangerousness special issue to be considered supported by legally sufficient evidence.  Moreover, while petitioner characterizes the evidence presented to the jury as reflecting that he was capable of a peaceful existence in the prison environment, in actuality the evidence presented established that, after petitioner was convicted and sent to prison for the murder of the convenience store clerk, he continued to violate prison rules, both major and minor (R. 36:138-43; R. 37:50-5, 62-77, 85-8, 92-6, 103-06).  Furthermore, as noted by the Court of Criminal Appeals in its decision on direct appeal, it was proven at the penalty phase of the trial that Petitioner murdered another person five months after the killings at the Blockbuster and Petitioner himself told a reporter that he "possibly" killed nine or more people. *Dorsey*, slip op. at 7-8.  Given the evidence supporting the jury's decision, it cannot be said that the state court's decision is an unreasonable application of the *Jackson* standard.  This claim is without merit, and it is denied.

**D.**     **Claims regarding Petitioner's Challenges for Cause**

In his fourth through seventh grounds for relief, petitioner claims that the trial court erred when it denied his challenges for cause to four members of the venire.  Petitioner contends that his rights under the Sixth, Eighth, and Fourteenth Amendments were violated when the trial court denied petitioner's challenges for cause to veniremembers Don Merrifield, Michael O'Keefe, Alan Brunson, and Russell Staten.  In particular, petitioner asserts that Merrifield was challengeable because he had a bias in favor of the death penalty and O'Keefe, Brunson, and Staten were challengeable because they refused to consider youth as a mitigating factor when considering the appropriate penalty for a capital murder defendant.

The Court of Criminal Appeals addressed these claims in two separate reviews.  Specifically, on direct appeal, the Court of Criminal Appeals held that the trial court had not erred in denying the

defense's challenge for cause to Juror Merrifield because, after questioning from the trial judge and after the judge explained the state's burden of proof at the punishment phase of the trial, Merrifield stated that he could follow the law and would require the state to prove beyond a reasonable doubt that petitioner would be a future danger to society before he would answer the first special issue "yes."  The Court of Criminal Appeals further held on direct appeal that the trial court had not abused its discretion in denying the defense challenge for cause to Juror O'Keefe because he would not consider youth as mitigating evidence because a venire member is not subject to a challenge for cause because he gives no weight to age as a mitigating factor. *Dorsey*, slip op. at 18-9.  Then, at the state habeas level, the state habeas court concluded that petitioner's constitutional rights were not violated when the trial court denied the challenge for cause to Merrifield because Merrifield did not have a bias in favor of the death penalty in that he had stated that he could give a life sentence if presented with sufficient mitigating evidence, he believed that jurors should keep an open mind regarding the punishment special issues, and he would hold the State to its burden of proof with respect to the first special issue. (SHTr.:340-41).  The state habeas court further concluded that petitioner's constitutional rights were not violated when the trial court denied the challenges for cause to O'Keefe, Brunson, and Staten because the law does not require jurors to consider any particular fact or circumstance mitigating. (SHTr.:341-42).  When the Court of Criminal Appeals reviewed these issues for the second time, it adopted these conclusions of the state habeas court.

These conclusions are not contrary to federal law.  The standard for determining whether a veniremember may be excluded for cause is whether his views would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Wainwright v. Witt*, 469 U.S. 412, 424 (1985).  With respect to the alleged bias towards the death

penalty, the Supreme Court has held that due process requires that a jury determining sentencing at a capital murder trial must be impartial and that, therefore, a defendant may challenge for cause any prospective juror who would automatically vote to impose death if the defendant is convicted of a capital offense. *Morgan v. Illinois*, 504 U.S. 719, 730 (1992). With respect to the consideration of mitigating evidence, a state's sentencing guidelines must not be preclude jurors from considering, as a mitigating factor, any aspect of a defendant's character or background, including a defendant's youth. *Johnson v. Texas*, 509 U.S. 350, 367 (1993); *Lockett v. Ohio*, 438 U.S. 586 (1978). However, a defendant in a capital case is not entitled to challenge prospective jurors for cause simply because they might view the evidence the defendant offers in mitigation of a death sentence as aggravating evidence instead. *Soria v. Johnson*, 207 F.3d 232, 244 (5th Cir. 2000).

In the case at hand, Juror Merrifield initially stated that a person who intentionally kills someone should receive the death penalty (R. 14:169-70), but, after the law was explained to him, he later stated that he could assess a life sentence if presented with sufficient mitigating evidence, and he would require the State to meet its burden of proof with respect to the future dangerousness special issue before he would answer the issue in the affirmative. (R. 14:154-55, 210). Accordingly, the record before this Court indicates that, contrary to petitioner's contention, Merrifield was not challengeable for cause because he did not state that he would automatically vote for the death penalty should petitioner be convicted.

Furthermore, while Jurors O'Keefe, Brunson, and Staten all expressed personal reluctance to consider a defendant's youth as a mitigating factor, (R. 23:79; R. 26:242; R. 29:106), the jury **itself** was not prevented from considering petitioner's youth as a mitigating factor, either through the future dangerousness or the mitigating special issues. Thus, no Supreme Court precedent was

18

violated when the trial court declined to grant the defense challenges for cause to these jurors. Moreover, as noted earlier, the Fifth Circuit has specifically stated that a juror is not challengeable for cause because he might view a factor as aggravating, rather than mitigating.  Following this reasoning, a prospective juror's statement that he does not consider a certain type of evidence as mitigating does not subject him to a challenge for cause because it is not evidence that he will be unable to perform his duties as a juror. *See Wainwright v. Witt*, 469 U.S. at 424.

Moreover, even if the trial court erred in denying defense counsel's challenges for cause to these four potential jurors, petitioner cannot establish a federal constitutional violation because he has failed to prove that the jury in his capital murder trial was, in fact, not an impartial one.  *Ross v. Oklahoma*, 487 U.S. 81 (1988), addressed a case where a capital murder defendant used a peremptory challenge to remove a potential juror from the jury panel for his trial after his challenge for cause was denied by the trial court.  On appeal, Ross argued that, because the juror was excusable for cause under *Witherspoon v. Illinois*, 391 U.S. 510 (1968), his right to an impartial jury and to due process of law were violated because the trial court did not excuse him from the panel. *Ross*, 487 U.S. at 83-84.  The Supreme Court held that Ross's federal constitutional claims were without merit because any claim that a jury was not impartial or that due process has been denied because a court erred in not granting a challenge for cause must focus on the jurors who sat on the jury, not jurors who were removed, even if peremptory challenges were used to remove the jurors, because the loss of a peremptory challenge is not a violation of a constitutional right. *Id.* at 85, 88-89.

Thus, in the instant case, even assuming for the purpose of argument that these veniremembers should have been excused for cause, petitioner acknowledges that they were all peremptorily struck by defense counsel and did not serve on the jury. (R. 14:216; R. 23:84; R.

19

26:257; R. 29:108).  While petitioner has summarily stated that he was forced to accept Juror Lara

Schmukler, who was not an acceptable juror to him, he has not alleged, much less shown, that Juror

Schmukler was not an impartial juror.  Accordingly, petitioner's claim that his constitutional rights

were violated because the trial court did not grant these challenges for cause is without merit.  These

grounds for relief are without merit, and they are denied.

**E.**     ***Batson* claim**

        In his eighth ground for relief, petitioner alleges that the State exercised a peremptory

challenge during jury selection in a racially discriminatory manner in violation of *Batson v.

Kentucky*, 476 U.S. 79 (1986).  Specifically, petitioner asserts that he was denied equal protection

under the law in violation of the Fourteenth Amendment when the State used a peremptory challenge

to prevent an African-American man, Jerry Riley, from sitting on the jury and failed to articulate a

credible race-neutral explanation for the strike.

        In *Strauder v. West Virginia*, 100 U.S. 303 (1880), the Supreme Court held that when a black

defendant has been tried by a jury from which members of his own race have been purposely

excluded, he has been denied equal protection of the law.  In *Batson v. Kentucky*, 476 U.S. 79

(1986), the Court reaffirmed this holding and further held that the Equal Protection clause forbids

a prosecutor from using his peremptory challenges to challenge potential jurors solely on account

of their race. *Id.* at 88.  The Court also held that, in order to establish a claim of purposeful racial

discrimination in the jury selection process by the use of peremptory challenges by the prosecutor,

a criminal defendant must first make out a *prima facie* case of purposeful discrimination by first

showing that he is a member of a racial group capable of being singled out for differential treatment

and that the prosecutor has exercised peremptory challenges to remove from the jury panel members

20

of his race.  A defendant must then show that these facts and other circumstances raise an inference

that the prosecutor used the practice to exclude veniremembers based on their race.  Once this

showing has been made, the burden then shifts to the State to provide a race-neutral explanation for

challenging the jurors. *Id.* at 96.  If the State presents a racially-neutral explanation for a strike, the

trial court must decide whether the defendant has carried his burden of proving purposeful racial

discrimination. *Id*. at 98; *Purkett v. Elem*, 514 U.S. 765, 767-68 (1995).

In making the decision as to whether the defendant has met his burden of proof, the

truthfulness of the prosecutor's explanation must be determined by assessing the credibility and

demeanor of the State's attorney. *Hernandez v. New York*, 500 U.S. 352, 365 (1991).  This judgment

is one which lies "peculiarly within a trial judge's province." *Id*.  The standard of review is "clear

error," and a trial court's ruling should not be considered clearly erroneous unless a reviewing court

has the firm conviction that a mistake has been committed.  *United States v. Cobb*, 975 F.2d 152,

154-56 (5th Cir. 1992), *citing Hernandez*, 500 U.S. at 369.

After veniremember Jerry Riley was questioned by both the State and the defense during voir

dire, the State attempted to challenge him for cause on the basis that he could not give the minimum

sentence in a murder case, he would not find a defendant not guilty if the State failed to establish the

correct cause of death, and he would automatically answer the first special issue "yes" if a defendant

was convicted of capital murder. (R. 16:203).  The trial court questioned Riley again and then denied

the State's challenge for cause. (R. 16:205-215).  The prosecutor then indicated that he intended to

peremptorily strike Riley, and defense counsel made a *Batson* objection because Riley is African-

American. (R. 16:215).  The prosecutor explained that Riley was not an acceptable juror for the State

because he had a friend who had been convicted and had spent twenty years in prison for murder,

and there were similarities between that case and petitioner's case that concerned the State.   In

particular, Riley was at a party where a murder occurred; Riley's friend, Rodney, who committed

the murder, was around the same age as petitioner when he committed murder; Rodney had told

Riley that he did not mean to shoot the person, although the victim was shot in the back; Rodney

confessed to Riley the following day, and Riley encouraged him to turn himself in to police; Riley

did not testify at his friend Rodney's trial; and Riley has resumed his friendship with Rodney after

he was paroled and believes him to be doing fine with a monitor on his leg. (R. 16:216-18).   The

prosecutor went on to state that his primary concern with the similarities in the case was the fact that

Riley had remained friends with Rodney, converses with him regularly, and believes that he is doing

"fine." (R. 16:219).   The prosecutor also reiterated the previous reasons he gave for the challenge

for cause. (R. 16:218-19).   Defense counsel responded that Riley has stated that his friend had

received "what he deserved" and perhaps less that what he deserved, Riley stayed at the scene to help

the victim, and he did not speak to the police at the scene because others had already told the police

that Rodney shot the victim.   Defense counsel further stated that Riley's responses indicated that he

acted as a responsible citizen and that, therefore, the reason given by the State for striking Riley was

suspicious. (R. 16:220).   The trial court then sustained the peremptory strike over the *Batson*

challenge, finding that the reasons given were racially neutral and Juror Riley's rights had not been

violated. (R. 16:220).

At the state habeas level, the state court concluded that petitioner had failed to establish a

*Batson* violation because the explanations for the peremptory strike given by the prosecution were

race-neutral and that petitioner had failed to meet his burden of establishing that the State's reasons

for the strike were pretextual in nature. (SHTr.:345-48).   This conclusion is not an unreasonable

22

application of the *Batson* standard because the reasons given by the State for striking Riley are facially race-neutral and petitioner has failed to show that they were pretextual in nature.

Petitioner contends that the reasons given by the State for striking Juror Riley were pretextual in nature because: 1) there is nothing in the record that indicates that the similarities between petitioner's case and the murder committed by Riley's friend would affect Riley's ability to be a fair and impartial juror; and 2) the prosecutor did not ask Riley if any similarity would influence him. (Petition at 98-9). These concerns, however, do not rise to the level of establishing that the trial court's determination that the reasons for the strike were not race-based was a clearly erroneous determination because they are not sufficient proof to a reviewing court that a mistake has been committed. *See Cobb*, 975 F.2d at 154-56.

This Court is mindful that the Supreme Court recently handed down a decision in which it reversed the conviction of a man convicted in Dallas County, Texas on the basis of *Batson*. In *Miller-El v. Dretke*, 545 U.S. 231, 125 S.Ct. 2317, 2340 (2005), the Supreme Court held that the state court findings that the reasons articulated for several peremptory strikes were race-neutral and nonpretextual were shown to be incorrect by clear and convincing evidence. In *Miller-El*, however, the Court based its decision on the fact that Miller-El had presented evidence that: 1) ten of eleven African-American veniremembers had been peremptorily struck by the State, leaving one African-American on the jury; 2) the reasons given for peremptorily striking the African-Americans, such as certain answers to questions, applied equally to similar non-blacks who were permitted to serve on the panel; 3) the State shuffled the jury two different times when a large number of African-Americans were in the front of the venire panel; 4) the State posed contrasting questions to blacks and non-blacks, using graphic descriptions of the death penalty to African-Americans and bland

language to others; and 5) the Dallas County District Attorney's office had, for decades preceding Miller-El's trial, followed a policy of systematically excluding African-Americans from juries. *Id*. at 2325-30, 2332-39.

In the case at hand, however, while petitioner was convicted in Dallas County, Texas, petitioner has presented no evidence concerning the racial make-up of the jury that sat in his trial and no evidence about the percentage of African-Americans who were struck by the State. The record before this Court is that the defense challenged three other peremptory strikes on the basis of *Batson* (R. 23:149-60; R. 25:53-8; R. 27:78-88), unsuccessfully, but there is no other evidence before this Court about the racial make-up of the jury or the race of other jurors who were either accepted or struck by the State. And, the reasons given for the other three *Batson*-challenged strikes were different. The prosecutor stated that he struck Juror Hooper because he was not a strong advocate of the death penalty and believed it had been misused (R. 23:150-52); struck Juror Davis because he did not want to put anyone on death row, did not believe the death penalty was a deterrent, and had a daughter who went to jail whom he believed was innocent (R. 25:53-6); and struck Juror Alee because she had had several arrests and stated on her questionnaire that she believed that police officers were dangerous and prejudiced. (R. 27:78-81). Petitioner has never raised as a claim on appeal the denial of any of these *Batson* challenges.

Petitioner has presented no evidence that African-American veniremembers were questioned in a different manner than white jurors or that there were white jurors who were accepted by the State who had a background similar to Juror Riley (i.e. having a friend convicted of murder) or who answered the State's questions in a similar manner. Without such evidence, petitioner has failed to meet his burden of proving purposeful racial discrimination such that the trial court's determination

that the reasons given by the prosecution for striking Juror Riley would be considered clearly erroneous.  Petitioner has not presented sufficient evidence to support his argument that this Court should find that the state court conclusions with regard to this issue are unreasonable ones.  This claim is without merit, and it is therefore denied.

F.     **Special Issues' Terms Claim**

In his ninth ground for relief, petitioner claims that the special issues that a capital jury is required to answer at the punishment phase of a Texas death penalty trial are unconstitutional because a number of terms used are not defined for the jury.  In particular, petitioner complains that the terms "probability," "criminal acts of violence," "continuing threat to society," and "mitigating circumstances" are unconstitutionally vague terms that were contained in the special issues the jury was required to answer but were not defined for the jury.

As noted earlier, at the punishment phase of the trial, the jury was required to answer the following two special issues:

> Do you find from the evidence beyond a reasonable doubt that there is a probability that the defendant, Leon David Dorsey IV, would commit criminal acts of violence that would constitute a continuing threat to society?

> Do you find, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, that there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed?

(Tr.: 236-37).  Petitioner contends that the failure to define certain terms in these special issues violates the constitutional requirement that a statutory aggravating circumstance "genuinely" narrow the class of persons eligible for the death penalty and "reasonably justify the imposition of our most severe penalty." (Petition at 101-102). *See Zant v. Stephens*, 462 U.S. 862, 878 (1983); *Godfrey v.*

25

*Georgia*, 466 U.S. 420 (1980).  Petitioner argues that definitions of these terms would have been, in essence, limiting instructions on the jury's sentencing discretion.

The Fifth Circuit has consistently held that these terms are not unconstitutionally vague and can instead be understood in their common meaning. *Woods v. Johnson*, 75 F.3d 1017, 1033-34 (5th Cir. 1996) (noting the long line of Fifth Circuit cases holding that the terms in the Texas punishment special issues need not be defined in the jury instructions); *James v. Collins*, 987 F.2d 1116, 1119-20 (5th Cir. 1993) (not necessary to define "deliberately," "probability," "criminal acts of violence," or continuing threat to society"); *Nethery v. Collins*, 993 F.2d 1154, 1162 (5th Cir. 1993) (not necessary to define "deliberately," probability," or "society"); *Thompson v. Lynaugh*, 821 F.2d 1054, 1060 (5th Cir. 1987) (holding that "deliberately" need not be defined as its common meaning is sufficiently clear to allow jury to answer special issues).  Indeed, in *Milton v. Procunier*, 744 F.2d 1091, 1095-96 (5th Cir 1984), the Fifth Circuit noted that the term "probability" has a plain meaning such that the discretion left to the jury in answering the future dangerousness issue is no more than the discretion that exists in the jury system itself.

The Supreme Court has held that the future dangerousness special issue that the jury in the instant case was required to answer passes constitutional muster. *Jurek v. Texas*, 428 U.S. 262 (1976).  And, while the Supreme Court in *Penry v. Lynaugh*, 492 U.S. 302, 322-25 (1989), held that the future dangerousness special issue given to the jury in petitioner's case standing alone does not allow juries to consider adequately certain mitigating evidence such as mental retardation, the Supreme Court has never determined that the federal constitution requires that terms used in that issue be given specific definitions.  Moreover, with respect to petitioner's claim that the phrase "mitigating evidence" is unconstitutionally vague, included in the punishment jury charge was the

26

statement that, with regard to the second special issue: "in arriving at your answer, you shall consider mitigating evidence to be evidence that a juror might regard as reducing the defendant's moral blameworthiness." (Tr.:232-233). Contrary to petitioner's argument, the term "mitigating evidence" was defined for the jury.

The state habeas court concluded that petitioner's constitutional rights were not violated by the omission of definitions of the terms "probability," "criminal acts of violence," and "continuing threat to society." (SHTr.:350-51). Given the long line of Fifth Circuit precedents supporting this decision, it cannot be said that this decision at the state habeas level denying this claim for relief is contrary to clearly established federal law. The state habeas court further concluded that "mitigating evidence" was defined for the jury and therefore this claim was without merit. (SHTr.:349-50). This conclusion is not contrary to federal law. Accordingly, this claim is without merit, and it is denied.

## G.     Mitigation Special Issue Claim

In his tenth claim, petitioner asserts that he was denied his constitutional rights under the Eighth and Fourteenth Amendments because the jury in his trial was misled about the effect of a "no" vote by a single juror to the future dangerousness special issue or a "yes" vote by a single juror to the mitigation special issue. Petitioner contends that, because the parties are not allowed to inform the jury that one hold-out juror on either special issue would result in a life sentence, but the jury is instead instructed that ten "no" votes on the first special issue or ten "yes" votes on the second special issue are required to impose a life sentence, jurors may feel coerced into voting in such a way that imposes the death sentence, believing that a single vote would have no effect.

As noted earlier, the jury in petitioner's case was required to answer two special issues, those being the future dangerousness issue and the mitigation issue. The jurors were instructed that they

could not answer the future dangerousness issue "yes" or the mitigation issue "no" unless all twelve jurors were unanimous in that decision.  They also were instructed that they could not answer the future dangerousness special issue "no" or the mitigation special issue "yes," unless at least ten jurors agreed with that answer, which would then result in a life sentence. (Tr.:3).  This is commonly known as the "12-10" rule. However, under Texas state law, if the jury fails to reach a decision regarding either special issue in a capital murder case, the defendant will receive a life sentence.  By law, none of the parties are permitted to inform the jury this result should the jury fail to reach a verdict. TEX. CODE CRIM. PROC. ANN. art 37.071 § 2(a)(1), (g) (Vernon 1993).

The defense filed a motion with the court asking that the Texas capital sentencing scheme be ruled unconstitutional because, among other things, the "12-10" rule violates the Eighth and Fourteenth Amendments.  This motion was denied by the trial court. (Tr.:185-89).  In this motion, and in his federal petition, petitioner cites *Mills v. Maryland*, 486 U.S. 367, 383 (1988), a case in which the Supreme Court struck down Maryland's capital sentencing system because a single juror could preclude the jury from considering certain evidence to be mitigating and the jury could be prevented from considering mitigating factors if the twelve jurors did not agree on what the specific facts were.  At the state habeas level, the trial court, citing both *Mills* and *Jones v. United States*, 527 U.S. 373 (1999),  concluded that the "12-10" rule as dictated by Article 37.071 does not violate the federal constitution because it is not constitutionally required that a jury be informed of the consequences of a deadlock.  (SHTr.:354-57).  This conclusion is not an unreasonable application of federal law.

In  *Jones v. United States*, the United States Supreme Court addressed the question of whether a federal death penalty defendant's Eighth Amendment rights were violated because the

jurors in his case were not given a jury instruction at the punishment phase of the trial regarding the consequences of a jury deadlock at punishment.   Because *Jones* was a federal death penalty case, under the federal death penalty statute, the jury was required to consider all aggravating and mitigating factors and determine whether the aggravating factors outweighed the mitigating factors. All aggravating factors in a federal death penalty case must be proven beyond a reasonable doubt, whereas the jury may consider a mitigating circumstance so long as one juror finds that its existence has been established by a preponderance of the evidence.   In *Jones*, the jury unanimously found the existence of two statutory and two non-statutory aggravating factors beyond a reasonable doubt and various jurors found the existence of ten mitigating factors.   After weighing these factors, the jury unanimously recommended that Jones be sentenced to death.   The jury did not receive an instruction requested by the defense which informed the jurors that if they were unable to reach an unanimous decision with regard to the sentence to be imposed, the judge should be informed and would then impose a sentence of life imprisonment without possibility of parole.   *Jones*, 527 U.S. at 376-80.

Although the Supreme Court in *Jones* acknowledged that it had previously held that a death sentence could not be imposed arbitrarily, that a jury must be given a vehicle in which all relevant mitigating evidence may be considered at the punishment phase of a capital murder trial, and that a jury cannot be affirmatively misled regarding its role in the sentencing process, the Court held that the Eighth Amendment was not violated simply because the jury was not informed of the consequences of a deadlock on the issue of punishment.   Specifically, the Court held that the federal constitution was not violated because: 1) the jury in Jones' case was not misled about its role at punishment; 2) the object of the jury system is to secure unanimity by a dialogue among the jurors; and 3) in a capital sentencing proceeding the government has a strong interest in having the jury

express the conscience of the community that might be undermined if the jury was informed about the consequences of a deadlock. *Id.* at 382. Moreover, although four justices dissented in *Jones* because they believed that an instruction regarding the effect of a jury deadlock was constitutionally required in the case, in the dissenting opinion authored by Justice Ginsburg, it is not disputed that the Eighth Amendment does not require that a jury be instructed as to the consequences of a failure to agree, but it is instead argued that such an instruction was necessary in *Jones* because of particular instructions given to the jury in that case which, the dissent argued, created a reasonable probability that the jurors in that case mistakenly believed that Jones could be sentenced to something less that life without parole for his crime. *Jones,* 527 U.S. at 418, n. 20. Because those instructions were peculiar to that case, both the majority and the dissenting opinions in *Jones* make clear that the Supreme Court does not consider it a requirement of the Eighth Amendment that a capital jury be informed of the consequences of a failure to agree with respect to its verdict at the punishment phase of the trial.

Although *Jones* did not specifically address Petitioner's Fourteenth Amendment claim, since *Jones* was handed down by the Supreme Court, the Fifth Circuit has held that an argument that the "12-10" rule in Texas violated a capital murder defendant's Eighth and Fourteenth Amendments was without merit. *Alexander v. Johnson*, 211 F.3d 895, 897, n. 5 (5th Cir. 2000). Moreover, the Fifth Circuit has also consistently held that any ruling that the "12-10" rule violated the federal constitution would be a it would be a new constitutional rule of criminal procedure as defined in *Teague v. Lane*, 489 U.S. 288, 311-13 (1989), that did not place certain kinds of individual conduct beyond the power of the criminal law-making authority to proscribe and was not a watershed rule of criminal procedure, and therefore could not form the basis for federal habeas corpus relief. *See*

*Hughes v. Dretke*, 2005 WL 1384580 (5th Cir. June 10, 2005); *Alexander*, 211 F.3d at 897; *Davis v. Scott*, 51 F.3d 457, 467 (5th Cir. 1995); *Webb v. Collins*, 2 F.3d 93 (5th Cir. 1993).  Accordingly, this ground for relief is without merit, and it is denied.

## H.    Texas' Death Penalty Scheme Claim

In his eleventh ground for relief, petitioner claims that Texas' death penalty scheme is unconstitutional under the Fifth, Eighth, and Fourteenth Amendments.  Petitioner contends that Texas' statutory scheme which addresses the death penalty is unconstitutional because it is impossible to both simultaneously restrict a jury's discretion to impose the death penalty and allow the jury unlimited discretion to consider all evidence militating against the imposition of the death penalty.

As support for this argument, Petitioner cites Justice Blackmun's dissent in *Callins v. Collins*,  510 U.S. 1141 (1994).  Petitioner argues that this Court should declare that the death penalty as applied to him is unconstitutional because, as Justice Blackmun argued in *Callins v. Collins*, no death penalty statute can adequately follow Supreme Court precedent and both eliminate all arbitrariness from the assessment of the death penalty and provide the sentencer with sufficient discretion to consider and act upon the unique circumstances of each defendant.

Petitioner was indicted and tried for capital murder for killing a person during the course of committing or attempting to commit a robbery, one of the subsets of murder that is eligible for the death penalty in Texas. (Tr. 2; TEX. PEN. CODE ANN. § 19.03 (Vernon 1994)).  Contrary to Petitioner's argument, the Supreme Court upheld a version of the Texas death penalty statute in *Jurek v. Texas*, 428 U.S. 262 (1976), which, like the version of the statute under which Petitioner was tried and sentenced, narrowed the class of offenders who were subject to a death sentence to a

specific subset of murder defendants.  Thus, the Supreme Court has specifically ruled that the manner in which Texas narrows the class of murderers eligible for the death penalty passes constitutional muster by eliminating arbitrariness in the determination of who is eligible to received the death penalty.

With regard to Petitioner's allegation that the Texas death penalty scheme fails to allow adequate discretion in considering mitigating evidence, the Supreme Court did note in *Tuilaepa v. California*, 512 U.S. 967, 974 (1994) that, "[i]n providing for individualized sentencing, it must be recognized that the States may adopt capital sentencing processes that rely upon the jury, in its sound judgment, to exercise wide discretion."  Moreover, citing *Zant v. Stephens*, 462 U.S. 862, 875 (1983), the Court in *Tuilaepa* specifically stated that a sentencer may be given unbridled discretion in determining whether to impose the death penalty once it is determined that the defendant is a member of the class that is eligible to receive the death penalty. *Tuilaepa*, 512 U.S. at 979-980. These cases illustrate the requirement that, so long as the class of murder defendants is sufficiently tailored to avoid arbitrariness and a state provides a vehicle that is sufficient for the jury to consider all relevant punishment evidence, both aggravating and mitigating, a state capital sentencing statute will be considered constitutional.

With respect to the special issues given to the jury to answer in Petitioner's case, in *Jurek* the Supreme Court approved of the Texas future dangerousness issue and has continued to do so in subsequent cases. *See Pulley v. Harris*, 465 U.S. 37, 50-1 (1984).  And, although in *Penry v. Texas*, 429 U.S. 302, 324-5 (1989), the Supreme Court held that certain mitigating evidence could not be adequately considered within the scope of the future dangerousness issue that the jury in Petitioner's trial received, Petitioner was tried after the Texas legislature amended Article 37.071 in order to

address the Supreme Court's concerns in *Penry* and added the mitigation special issue which petitioner's jury received. The Supreme Court has since implicitly approved of the new mitigation issue as an adequate vehicle for the consideration of all mitigating evidence. *See Penry v. Texas*, 532 U.S. 782, 803 (2001) (Penry II). Specifically, in *Penry II*, the Supreme Court made the following comments regarding the mitigation issue added to the statute in 1991:

> A clearly drafted catchall instruction on mitigating evidence also might have complied with Penry I. Texas' current capital sentencing scheme (revised after Penry's second trial and sentencing) provides a helpful frame of reference. Texas now requires the jury to decide '[w]hether, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed.' Penry's counsel, while not conceding the issue, admitted that he 'would find a tough time saying that [Penry I] was not complied with under the new procedure.' At the very least, the brevity and clarity of this instruction highlight the confusing nature of the supplemental instruction actually given, and indicate that the trial court had adequate alternatives available to it as it drafted the instructions for Penry's trial.

*Penry*, 532 U.S. at 803. (internal citations omitted).

Thus, through various decisions, the Supreme Court has held that the Texas statute that establishes the subset of murderers eligible for the death penalty is constitutional and that the future dangerousness punishment special issue is a constitutionally adequate vehicle for juries to consider aggravating and most mitigating evidence. Moreover, in *Penry II*, the Supreme Court indicated that, unlike other jury instructions and special issues, the mitigation special issue given to and answered by the jury in Petitioner's case is an adequate vehicle for juries to consider all mitigating evidence.

The Fifth Circuit also recently held an identical claim to be both without merit. *Hughes v. Dretke*, 412 F.3d 582, 593-94 (5th Cir. 2005), *cert. denied*, 126 S.Ct. 1347 (2006). Furthermore, the

Fifth Circuit in *Hughes* held that this claim was procedurally barred under *Teague v. Lane*, 489 U.S. 288 (1989), because even if the claim was found to have merit, it would constitute a new constitutional rule of criminal procedure that would not be applicable retroactively to cases on collateral review. *Hughes*, 412 F.3d at 594; *see also Teague*, 489 U.S. at 311-13. When the state habeas court addressed this claim on its merits, that court concluded, based on prior case law from the Court of Criminal Appeals, that the Texas death penalty scheme does not constitute cruel and unusual punishment and does not violate petitioner's right to due process. (SHTr.:358). This conclusion is not contrary to established federal law, and this claim is therefore denied.

## I.    Cumulative Error Claim

In his twelfth and final claim for relief, petitioner alleges that he is entitled to habeas relief based on the cumulative effect of all the constitutional violations alleged in his petition. Specifically, petitioner asserts that, even if his constitutional claims do not, own their own, justify reversing the trial court's judgment, when their cumulative effect is considered, the constitutional errors that occurred at petitioner's trial so permeated the trial that petitioner was deprived of the "fundamental fairness" implicit under the Fifth and Fourteenth Amendments.

In *Derden v. McNeel*, 978 F.2d 1453 (5th Cir. 1992), the Fifth Circuit held that in order for a federal habeas petitioner to prevail on a claim of cumulative error at a state trial, he must establish that: 1) the individual errors involved matters of constitutional dimension rather than mere violations of state law; 2) the errors were not procedurally defaulted for habeas purposes; and 3) the constitutional errors so infected the entire trial that the resulting conviction violates due process. *Id.* at 1458.

34

As this Court has held in this opinion, the claims raised by petitioner are without merit and therefore do not establish any constitutional errors which infected the trial such that petitioner's conviction and sentence violate his due process rights.   The state habeas court also concluded that there was no cumulative error because petitioner had failed to establish any constitutional violations. (SHTr.:359).   This conclusion is not contrary to federal law, and it is denied.

IT IS THEREFORE ORDERED that Petitioner's Petition for Writ of Habeas Corpus be, and is hereby, DENIED.

The Clerk of Court shall transmit a true copy of this Order to Petitioner and to Counsel for Respondent.

SO ORDERED this 31st day of July, 2006.


ED KINKEADE
UNITED STATES DISTRICT JUDGE